## NEW YORK SUPERIOR COURT.

WILLIAM H. MASTERSON and others agt. ARTHUR SHORT and others.

The *common council of the city of New York*, have the power to establish *hackney coach stands*, either under the Montgomery charter, or under the act of the legislature of 1813.

Where the common council have established the *locus in quo*, as a hackney coach stand, and it not appearing that the licensees—defendants, are misusing the right they have under the ordinance, an *injunction* cannot issue to restrain them from occupying such stand, although such stand is established in front of the livery stable of the plaintiffs (opposite the Central Park), whereby the plaintiffs claim special damage by reason of the defendants soliciting and obtaining passengers, thus preventing the plaintiffs from obtaining the custom they would otherwise have.

If such injury to the plaintiffs does exist, still, the defendants' act being lawful, the only remedy of the plaintiffs is by application to the common council.

*Special Term, August,* 1867.

MOTION by plaintiffs for an injunction to restrain defendants from keeping hackney coaches on the public stand in front of the plaintiffs' livery stable, opposite the Central Park.

A. H. REAVY, *for plaintiffs, and motion.*
COLEMAN & SHAFER, *for defendants, opposed.*

JONES, J. This action can only be sustained on the ground that the act of the defendants in standing their carriages there where they do is a nuisance.

They stand their carriages in the place under the authority of an ordinance of the common council, establishing that portion of the street as a hackney coach stand.

If the common council had authority to make such ordinance, and the defendants have not stepped beyond the limits of the authority conferred by the ordinance, then their acts cannot be a nuisance.

A nuisance cannot be predicated of the lawful exercise of authority. This is the proposition laid down by Judge

DENIO, in *Davis* agt. *The Mayor, &c., of New York* (14 *N. Y. R.* 506).

Its correctness is too palpable, to need enforcement by argument.

This leads to a consideration of the power of the common council to establish hackney stands in the city.

The 14th section of the Montgomery charter provides, that the common council shall have full power to frame, constitute, ordain and establish such laws, statutes and ordinances, which to them shall seem good, useful or necessary for the good rule and government of all officers, ministers, artificers, citizens, inhabitants and residents of said city, within the limits thereof, and for the further public good, common profit, trade and better government and rule of the said city.

Chancellor KENT, in his *Commentaries* on the Dongan and Montgomery charter, says, in reference to this section : " These broad and latitudinary powers, were given to be exercised with sound discretion, and with a liberal spirit, commensurate with the growing wants and prosperity of a great commercial metropolis.    Though the charter would seem to contain a grant of ample powers, sufficient for all the purposes of a well ordered police, and for the good government of the city in its complicated concerns, yet the legislature has been in the practice of granting more specific and detailed powers, sometimes on the application of the common council, and more frequently without it.    These statutes are general, made in aid and confirmation of the general corporate powers on the subject, and sometimes with the avowed wish and consent of the corporation, such as the laws relating to hackney coaches, butchers," &c.    Then after referring to a number of statutory regulations, he proceeds : " Amidst such a multitude of statute regulations, it becomes difficult to know how far an ordinance of the council rests upon the authority of the charter, and how far on the authority of some special statute.    When the latter exists, the exercise of the powers is of course to be referred to the statute, as the more certain and paramount authority.    The

Masterson agt. Short.

city ordinances sometimes act concurrently with, and in aid of the statute power, though much more frequently the statute law comes in and carries out, to a definite and precise extent, the authority which lies dormant in the comprehensive powers of the charter. If we take up and run through the ordinances of 1833, and now in force, we shall find many of them to be the exercise of charter power simply; others are the exercise of charter and statute powers combined; and others again rest solely on the statute grant of authority. There is no doubt that when any of the ordinances alluded to, cannot be referred to the grant of power by any express statute provisions, the general and unlimited grant of ordinance power in this section of the charter, is sufficient to uphold and warrant it. The efficient checks against any abuse of such enlarged discretion are public opinion, the elective franchise, and the established principles of the constitution and of recognized common law. In addition to these checks, all coroporations are liable to legal process in behalf of the state, for non-user or mis-user of their right and power."

These views have not, it is true, the force of a decision of a court directly on the various points; but they are the expression of the opinion of a learned and able jurist, given in the performance of a public duty, and as such entitled to great weight and consideration. The views thus expressed, to me, seem to be correct, and as they are expressed with a legal acumen and pureness of diction not possessed by me, I have preferred to adopt his language to my own.

Among the ordinances of 1833, referred to by Chancellor KENT, is one establishing hackney coach stands. It was certainly his opinion that such establishment was by sufficient power.

As, however, his attention may not have been particularly called to that subject, and his opinion may have been founded on the general view of the scope and effect of the charter powers, without a close scrutiny of their effect on this particular subject, I will proceed to give that scrutiny.

The Seventh avenue was opened under the act of 1813.

By the terms of this act, it is held by the mayor, aldermen and commonalty, " *in trust,* that the same be appropriated and kept open for, or as part of, a public street ·*   *   * in like manner· as the other public streets   *   *   *   are and of right ought to be."

Under the general and broad charter powers above referred to, the common council would have authority to establish such rules and ordinances relative to the regulation and use of the streets by citizens, as are compatible with the trust upon which they hold it. · It is to be used as a public street. Such use, then, as is recogniged and declared by law, or long established custom to be a proper and legitimate use of a public street, or which the sovereign power has vested in the common council the right and power to grant, may be authorized.

The system of hackney coaches standing at designated places, in the streets of a city, grew out of the necessity of meeting the public demands.   A demand arose in cities for means of transit from point to point, other than by walking. As the city increased in extent of territory, and became more populous, the demand increased.   This gave rise to a class of men who procured one or more vehicles, according to their means, and plied the streets for hire.   It was soon found necessary to place these men under special police regulations, and as one of those regulations, to assign certain places in the streets where they might stand waiting for customers.   Such regulation was necessary for the control of the hackmen, and for the convenience of the public. Its object was to prevent the hackmen from traveling with their empty vehicles in search of custom, in the streets otherwise sufficiently crowded, and also to prevent their stopping and remaining for any considerable time at inconvenient places ; but the great object was to have hacks standing at various points where the public would be most likely to want them, and where they would cause the least inconvenience to other vehicles, or injury to the surrounding property.

The earliest record of hackney coaches that I have been able to find in the English law, is in 1654, when an act was

passed limiting the number of hackney coaches, and giving to the court of London the government and ordering thereof.

Subsequently, in the ninth year of the reign of Queen Ann, an act was passed giving to commissioners of pavements power to make by-laws, which should be binding on hackney coachmen.

Under this power the commissioners made regulations as to stands. Afterwards, in the twelfth year of the reign of George III, in 1772, an act was passed reciting that the hackney coaches frequently took their stands with coaches and chairs in crowded places, &c., and giving to certain commissioners power to direct and regulate at what places they should stand. Under this act, the commissioners made an order directing a coachman not to stand in a certain place in which he had been accustomed to stand. This led to a litigation. The counsel for the coachman contended that he was standing according to the regulations made under the act of Ann, and that the power given by the act of George III, did not authorize the commissioners named in that act to interfere with the stands previously established, but only to establish others. The counsel on the other side, argued, that the words of the statute of George III, were sufficiently comprehensive to authorize as well a discontinuance of stands already established, as the establishment of new ones, and so the court held.

The authority of the commissioners mentioned in the act of Ann, to establish stands under the general power conferred on them to make by-laws, which should be binding on hackney coachmen, was not questioned or doubted by the respective counsel, or by the court, but tacitly conceded. Thus the law of England stood in 1774. By it, the right of hackney coachmen to use the public streets in their vocation, as well to solicit passengers as to carry them, and the authority to control such use by the establishment of stands by a body on whom parliament had conferred a general power to make by-laws binding on the hackney coachmen, were fully recognized. When, then, in 1730, the crown of England granted to the city of New York, the charter known

as the Montgomery charter, by which, among other things, power was given to the common council to ordain and make such ordinances, which to them should seem good or necessary for the good rule and government of the body corporate, and of all the officers, ministers, artificers, citizens, inhabitants and residents of said city ; it then passed to the common council, under its general grant of power, the same authority to regulate hackney coaches and establish coach stands in the city of New York, which the crown was accustomed to delegate to certain bodies, to be exercised in the city of London, and other cities in Great Britain. This power has never been taken away by the legislature. On the contrary, it has been confirmed. By the act of 1813, the common council is authorized to regulate hackney coaches, and the owners and drivers thereof. As the general authority given by the act of Ann, carried with it the power to establish stands, so the general authority given by the act of 1813, carries with it the like power.

Again, hackney coaches standing in the streets, have existed so universally in England, and for so long a period (certainly since 1700, and perhaps further back), that the term hackney coach, conveys the idea to the mind of a coach standing in the street for hire. Thus, an eminent lexicographer (Webster), defines a hackney coach to be " a coach let for hire, commonly at stands in the streets." When, therefore, the legislature uses the term hackney coach, it must be deemed to use it in such sense as to cover coaches for hire standing in the streets, as well as those kept in stables for hire ; and as the legislature did not see fit to legislate against the custom of coaches standing in the street, but left their regulation to the common council, then passed to the common council, as an incident to such regulation, the power to prescribe places at which the coaches should stand, I have, therefore, come to the conclusion that the common council has the power to establish hackney stands, either under the Mongomery charter or the act of 1813. There does not seem to be any consistency between the use of streets by the public for passage to and fro, and a designa-

tion of a certain space in them where that public may obtain the means for such passage in a more convenient, rapid and easy manner than by walking. The latter is an incident to the former. In all large cities of Europe, such designation has been deemed a proper and legitimate use of the streets. Thus, in London, Liverpool, Dublin, Paris, Berlin, Vienna, and I am informed, in all the large European cities, stands in the streets for vehicles to be let for hire, are established. There is no reason why New York, the great commercial metropolis of the United States, should be without them. There can be no doubt that the legislature could, by express language, authorize their establishment by the common council.

The question in this case is, whether the common council has not the power without such express authorization? For the reasons above given, I think they have. The common council, then, having the power to establish hackney coach stands, and having established the *locus in quo*, as one, and it not appearing that the defendants are misusing the right they have under the ordinance, an injunction cannot issue.

A few words as to the special damage plaintiffs claim to have sustained. This, as I understand it, consists in the defendants soliciting and obtaining passengers, thus preventing plaintiffs from obtaining that custom they would otherwise have. In other words, they sustain damage from competion. It must be a strong and clear case of some violation of law or duty owed by the defendants to a plaintiff, to induce a court of equity to restrain competition in trade. If in this case, defendants leased a vacant lot alongside of plaintiffs, separated from the place where their carriages now stand only by the width of the sidewalk, and stood their carriages thereon, it would not be pretended that the court would restrain their soliciting passengers; yet the injury to the plaintiffs would be the same as it is now. Plaintiffs may urge that defendants, by having their coaches open to view, ready harnessed in the street, have an advantage over them; but they are entitled to use the stand in the same

way as defendants, and the affidavits show that they do so use it.

Again, plaintiffs say, the "defendants' not being under so much expense as we are, inasmuch as they do not hire so large a stable, can afford to carry people at less rates than we can, and thus underbid us." But the rates at which people are to be carried are fixed. Neither plaintiffs nor defendants can exceed them. It is not alleged that defendants charge less than the legal rates. Indeed, such an occurrence would be an anomaly. It is by no means certain but that the expense of each one of the defendants bears the same proportion to the number of carriages used by them, as the expense of plaintiffs does to the number used by them. It seems, therefore, to be reduced to this : that plaintiffs' injury consists either in their being unable to get more than the legal fare, by reason of the competition of defendants, or that by reason of defendants' carriages being there, the supply is so much greater than the demand, that plaintiffs' carriages do not get the amount of employment they otherwise would.

The first ground of injury is one which the courts cannot recognize. The second is one which, if it was clearly shown to exist, would be sufficient to entitle the plaintiffs to the remedy they seek, provided the act complained of was unlawful. The papers do not clearly show such cause of injury to exist. If, however, it does exist, still, the defendants' act being lawful, the only remedy of plaintiffs is by application to the common council. That body, upon considering the plaintiffs causes of complaint and the public interests, can apply a remedy, either by discontinuing the stand or limiting the number of coaches authorized to stand there.

It may be suggested that there is at present no ordinance regulating the rates of fare, and, therefore, were it not for defendants' competition, a much higher rate than usual could be charged by plaintiffs. The suggestion is one which is more likely to operate toward the withholding than the granting of the discretionary writ of injunction. If the check on extravagant demands, formerly existing in the

shape of ordinances, has been removed by the repeal of those ordinances, the greater reason why the check by way of competition should not be disturbed.

Plaintiffs' counsel contends that there is no longer in existence any ordinance establishing stands. He claims this on the ground that on the 24th of April, 1867, the common council adopted a resolution repealing all ordinances theretofore adopted by the common council relating to hackney coaches and carriages, and their owners and drivers. But it so happens that on the first of May, 1867, the common council adopted a resolution establishing the stand in question, with others. It is true, this resolution was passed by the boards of aldermen and councilmen, prior to the adoption of the resolution of the 24th of April, 1867, but it was not approved by the mayor until May 1, 1867. It, therefore, did not become a resolution or ordinance adopted by the common council, until May 1, 1867, since an essential element to such adoption is the approval of the mayor, or a passage over his veto, or his retention of the resolution for a certain period of time without approval or veto. (*Charter of* 1857 ; *Laws of* 1857, *vol.* 1, 876, §§ 11, 12, 13.) Consequently, on the 24th of April it was not an ordinance theretofore adopted by the common council, and did not fall within the repealing resolution of April 24, 1867. It is also true that the resolution of May 1, 1867, purports to be an amendment of a resolution of 1866, which latter resolution falls within the terms of the repealing resolution of April 24, 1867.

I am inclined to think that under the circumstances, the resolution of May 1, 1867, must be regarded as re-enacting the resolution of 1866, but whether it does or not, the establishment of the stand in question is an entirely new provision, and is to be regarded as enacted at the time the amended resolution took effect. (*Ely* agt. *Holton*, 15 *N. Y. R.* 595, *cited from* 599.)

I may notice an objection raised by defendants. It is, that the defendants are improperly joined as parties, because the acts of each one are wholly distinct from, and inde-

pendent of the acts of the other, and the complaint contains
no charge of combination. It is not necessary on this
motion to determine the point, but it would seem not to be
well taken. (*Daniel's Ch. Pr. vol.* 1, *p.* 306.)

The motion for an injunction is denied, with ten dollars
costs.