THE CITY OF NEW YORK, Plaintiff, *v.* YELLOW TAXI CORPORATION, Defendant.*

City Court of New York, New York County, January 7, 1935.

*Affd., App. Term, First Dept., without opinion, N. Y. L. J. Nov. 2, 1935, p. 1646.

*Paul Windels, Corporation Counsel,* for the plaintiff.

*James A. Doherty,* for the defendant.

RYAN, J. Action brought by the city of New York to recover from the defendant the sum of $1,800.

The complaint alleges that on or about January 1, 1933, the parties litigant entered into an agreement whereby the plaintiff leased to the defendant the privilege to maintain and operate " a hack stand at The Casino in Central Park " 'from January 1 to December 31, 1933, for the consideration of $150 per month in advance; that the defendant entered into the occupation of the privilege leased and has failed to pay the installments of rent during the said year. Those allegations are denied by the defendant, except it admits the non-payment of any sum of money during the time specified. For a separate defense the defendant alleges that Seventy-second street and East drive in Central Park (the place at which The Casino is located) are public highways and thoroughfares; that the plaintiff by its duly constituted authority has established a " Hack Stand " on the public highway designated as Seventy-second street and East drive in Central Park, and that during the times mentioned the defendant did pay to the plaintiff a hack license fee of ten dollars per annum for each taxicab operated by it and received a license from the plaintiff to use the streets as set forth in the complaint and every hack stand established by authority of the Code of Ordinances of said city of New York. The action was tried before the court without a jury.

Exhibit No. 1, introduced in evidence by the plaintiff, is a copy of a letter dated April 11, 1930, addressed to the defendant by the commissioner of parks in which is stated; " North of the Casino in Central Park there is need and space for the parking of six taxicabs to give service to patrons of the Casino. This service would be rendered approximately between the hours of 1.30 P. M. and 2.30 A. M. the following morning. I wish to issue a permit for such

parking to the taxicab company which offers the best terms to the city. I shall be glad to have you submit a proposition to me accordingly."

Exhibit No. 2 is a letter in reply addressed to the commissioner of parks by the defendant, reading as follows: " With regard to the permit for the privilege of placing cabs at the Casino, Central Park, the Yellow Taxi Corporation offers One hundred Fifty dollars a month for a fifteen cab stand."

Exhibit No. 3 is a copy of a letter from the commissioner of parks addressed to the defendant in the following language: " Your letter of May 31st submitting an offer of One hundred and fifty dollars ($150) per month for the privilege of a fifteen (15) cab stand adjacent to the Casino in Central Park, was received, and has been accepted. A permit will be issued to you accordingly."

Exhibit No. 4, also offered in evidence by the plaintiff, is a copy of the permit above referred to and reads in part as follows: " June 23, 1930. Permission is hereby granted to Yellow Taxi Corporation (C. J. Sinnott, President) of 623 West 57th Street, N. Y. C. to operate a hack stand for Fifteen (15) Taxi-cabs only at ' The Casino ' 72nd St. & East Drive in Central Park from July 1, 1930 to December 31, 1930. * * * The holder of this permit agrees to conduct the privilege in a manner satisfactory to the Department of Parks and the Department of Health, and to pay therefor to the Department of Parks the sum of $150.00 per month in advance. This permit is not transferable, is revocable at any time, and subject to the rules and regulations of the Department of Parks, and of any other Department concerned. In accepting same, the holder hereof obligates himself to pay the full rental for the entire period above specified," and purports to have been signed by the commissioner of parks.

Similar " permits " were issued to the defendant for the years 1931 and 1932 and copies received in evidence.

It may be noted that all of the " permits " contain a provision making them revocable at any time. For the year 1933, the time involved here, no " permit " was issued on January first, nor was any sent to the defendant for the reason the defendant failed to send a check for the sum of $150 for that month in advance.

The plaintiff now urges the claim that the defendant having used and paid for the alleged privilege during the three years preceding 1933, is a hold-over tenant and thereby estopped from questioning the authority of the city officials to issue such permits and that having used said " Casino stand " during 1933, should be required to pay the $1,800 for said year.

From the earliest times it has been the rule that to invoke the doctrine of estoppel its application to the fact must be mutual. Indeed, mutuality was the first of the nine rules of estoppel set forth in Coke on Littleton (First Insts. [Ed. 1818] vol. 3, lib. 3, chap. VI, p. 431, § 667–352-a), the author saying: " every estoppel ought to be reciprocal, that is, to bind both parties; and this is the reason, that regularly a stranger shall neither take advantage, nor be bound by the estoppel." To the same effect reference is made to Lord Bacon's Abridgement ([Ed. 1832] vol. 4, p. 852, Leases and Terms for Years), and see, also, *Welland Canal Co.* v. *Hathaway* (8 Wend. 480, 484). In modern times the doctrine was reiterated in the case of *Finnegan* v. *McGuffog* (203 N. Y. 342), Judge HAIGHT (at p. 351) saying: " In the case of *Jewell* v. *Harrington* (19 Wend., 471, 472) NELSON, Ch. J., says: ' The first rule laid down by Lord COKE in respect to estoppels is, that they must be reciprocal: that is, bind both parties; and this is the reason, he observes, that regularly, a stranger shall neither take advantage of nor be bound by an estoppel.' " Upholding the same principle see *Walwrath* v. *Redfield* (18 N. Y. 457, 460); *Pope* v. *O'Hara* (48 id. 446, 454); Herman on Estoppel (§§ 210, 213), and 2 McAdam Landlord & Tenant ([5th ed. 1934], p. 1477, § 345).

That the city authorities could at any time have ousted the defendant from any so-called exclusive hack stand during the year 1933 is also clear for the reason the People are not bound by any illegal acts of their officials. One of the early cases involving that point was *Fairtitle* v. *Gilbert* (2 Term Rep. 169; 100 Eng. Rep. 91), decided by Lord ASHURST in 1787. In *Wells* v. *Johnston* (171 N. Y. 324, 328); *People* v. *Santa Clara Lumber Co.* (213 id. 61, 67) and *Whitehall W. P. Co., Ltd.,* v. *Atlantic G. & P. Co.* (160 App. Div. 208, 211) it was held that the State could always set up illegality of official acts. And a similar ruling was made as to municipalities in the cases of *Miller* v. *Mayor, etc., of New York* (3 Hun, 35, 44) and *Kyser* v. *New York Central R. R. Co.* (211 App. Div. 500, 503). It must, therefore, follow that as there was no mutuality of estoppel the defendant may be heard on the defense raised.

Another question is presented in the case under consideration and that has to do with the law affecting taxicab stands and license fees. During the year 1913 the then mayor of the city of New York appointed a committee to investigate the rates charged by licensed hack and taxicab drivers and the large sums of money paid by them to hotels and restaurants for exclusive privileges in the highways adjacent thereto. As a result of such investigation a new taxicab ordinance was adopted which provided for rates of fares and public hack stands throughout the city. In appropriate pro-

ceedings in the Supreme Court, New York county, the constitutionality of the ordinance was attacked and in an exhaustive opinion by Mr. Justice SEABURY (*Yellow Taxicab Co.* v. *Gaynor*, 82 Misc. 94) the ordinance was upheld. His determination was affirmed by the Appellate Division (*Hotel Astor* v. *City of New York*, 159 App. Div. 888; *Yellow Taxicab Co.* v. *Gaynor*, Id. 893), and later the Court of Appeals affirmed on certified questions (*Waldorf-Astoria Hotel Co.* v. *City of New York*, 212 N. Y. 97).

In the meantime the Legislature took action which culminated in chapter 813 of the Laws of 1913, signed by the Governor on December 16, 1913, which act incorporated a new section of the Penal Law, known as section 444, making it a misdemeanor for "The owner * * * of any real property, or any other person * * * or corporation, who shall make or enter into any agreement, contract or arrangement whatsoever whereby the right is attempted to be granted to any * * * corporation to use any portion of any public highway * * * park * * * owned by * * * any municipality therein for the purpose of permitting any vehicle to stand while awaiting passengers for hire or as a private hack stand."

In the year 1924 the city of Syracuse, by ordinance, attempted to establish twenty private taxicab stands. A licensed operator of taxicabs in that city instituted proceedings and was granted an injunction restraining the authorities of that city from carrying out the provisions of said ordinance and it was declared illegal by Mr. Justice CHENEY in the Supreme Court, Onondaga county, in February, 1930 (*Farrell* v. *City of Syracuse*, 137 Misc. 472).

In view of the ordinances in effect in the city of New York during the year in question, providing only for public hack stands, the authorities above referred to and section 444 of the Penal Law, the conclusion naturally follows that any attempt to establish a private or exclusive hack stand adjacent to "The Casino" in Central Park was not only without authority, but illegal and void.

The verdict, therefore, must be directed in favor of the defendant, with appropriate exception to plaintiff. Ten days' stay and thirty days to make a case.