JOHNSON, P. J.
 

 The defendant, as the operator of a taxicab owned by the Luxor Cab Company, was arrested and prosecuted upon a charge of violating section 47 of ordinance No. 6979, adopted in 1926 and known as the taxicab ordinance, in that defendant “did unlawfully and wilfully stand upon a public street, to-wit, Ulloa Street and West Portal, on north side of Ulloa Street, while waiting employment by passengers, at a place designated and established for other vehicles or taxicabs and operated by the Yellow Cab Company in accordance with said ordinance.”
 

 It appears without conflict that the chief of police had issued a permit to the Yellow Cab Company for a taxicab stand located on city property on the northerly side of the tunnel at West Portal Avenue. The Luxor Cab Company had no permit for a stand at that location; but the defendant, operating a Luxor car, moved into and occupied the stand, so as to be there awaiting passengers during a temporary absence of the cab permittee, the Yellow Cab Company.
 

 After a hearing in the municipal court the defendant was found guilty of the charge, and a suspended sentence of five days was imposed.
 

 When the matter was originally presented on appeal, it was urgently insisted on behalf of defendant that the complaint fails to state facts sufficient to constitute a public offense ; and one of the grounds urged was that no penalty is prescribed for violation of section 47.
 

 That section ordains that “No taxicab or automobile, while awaiting employment by passengers, shall stand on any public street or place other than, or upon a stand designated or established in accordance with this ordinance.” And section 53 provides that every person violating any of the provisions of the ordinance shall be deemed guilty of a misdemeanor, made punishable by fine or imprisonment, or both, not exceeding designated limits. Such prescribed penalty applies to violations of section 47 as well as to acts pronounced unlawful in other sections.
 

 
 *Supp. 773
 
 While in some respects the complaint might well have been more precise, we are nevertheless of the opinion that it is sufficient in form to raise the question whether defendant was guilty of a public offense, in occupying without a permit the stand for which the permit was held by the Yellow Cab Company.
 

 That is a question of special interest to the Yellow Cab Company. But from the standpoint of the public the essential question is whether in default of a permit to the Luxor Cab Company, its operator, Galena, was guilty of a misdemeanor in taking a stand at the public place specified, while awaiting employment by passengers, regardless of whether a special permit for that stand had been issued under the ordinance to the Yellow Cab Company. In other words, does the ordinance furnish sanction for punishment of the defendant by reason of the fact that he stood his taxicab in a public place near the West Portal entrance of the tunnel, for the purpose of inviting employment by passengers, notwithstanding that his company had no permit for that place as a designated or established stand, and the place had not been designated as one of the open public stands set apart for convenience of the public under section 2 of the ordinance? At the trial the ordinance, in so far as it authorized assignment to a special stand, was attacked as unreasonable.
 

 In tracing the historical development of the municipal ordinance under consideration, Mr. Milton Marks, acting as
 
 amicus curiae,
 
 draws attention in his brief to the fact that the taxicab ordinance is an outgrowth and elaboration of an ordinance of the “horse and buggy” era, adopted in 1880 and denominated an ordinance “regulating the Use of Vehicles on Public Streets and Boats in the Waters of the Bay”. Section 4 of that ordinance in relation to hackney carriages and hack stands, together with additions made by ordinance No. 1898, adopted in 1912 in recognition of the increasing use of automobiles and taxicabs, became the model for sections 2, 3, and 47 (as well as certain other sections) of the taxicab ordinance of 1926.
 

 Those earlier ordinances, like section 2 of the present ordinance, established certain specified public stands at docks, railroad depots and certain public squares, which were made open to all the classes of vehicles within the scope of the respective ordinances. After setting apart such open public stands, those forerunners then provided, as does the taxicab
 
 *Supp. 774
 
 ordinance in section 3, for stands on the public streets for occupation by vehicles seeking patronage.
 

 Preliminarily to the establishment of a stand in front of private premises, the written consent of the tenant or lessee of the ground floor fronting the proposed stand, or consent of the owner of unoccupied premises, must first be obtained. This provision is without direct application in the present ease as the stand in question was not located in front of private premises; but we shall have occasion to refer later to this requirement.
 

 Following the taxicab ordinance, a revision of the traffic ordinance was made in 1927 by ordinance No. 7691, which in section 36 (b) declares it to be unlawful for any operator of a vehicle to stand the vehicle in a duly established taxicab stand, “provided however, that this provision shall not apply to the operators of duly licensed taxicabs authorized to occupy said stands”.
 

 To come within that proviso a taxicab must not only be duly licensed under license laws as a public passenger vehicle; but, except where using a declared open stand, the taxicab, according to the fair meaning of the language of the ordinance, must be “authorized to occupy” a specially established stand. And in regard to licenses therefor, section 3a of the taxicab ordinance authorizes occupancy of a specially designated stand “after permit to operate said vehicle or vehicles has been issued, . . . and the license fee has been paid as in this or other ordinances provided”. By amendment made in 1926, adding section 54% to ordinance No. 5132 imposing license taxes, the holder of each permit for a public passenger —vehicle stand on any public street is required to pay a license fee of $2.50 a quarter for each vehicle permitted to stand thereat.
 

 Thus qualification for specific assignment and occupancy of a closed taxicab stand is conditioned on payment of such license fee and the procurement of a special “stand-permit”. And after the adoption of the new charter, there was enacted in furtherance thereof in 1932 ordinance No. 9143, whereby in subdivision 11 of section 1 provision was made for issuance by the police department of permits “for maintenance of authorized stands for vehicles for hire”. The procedure relative to application for issuance of permits and the administrative details to be observed are prescribed in a collateral ordinance No. 3.0411 adopted February 1, 1932. And
 
 *Supp. 775
 
 a permit after being duly issued may, upon its expiration, be automatically reissued by the tax collector on receipt of the license fee for the succeeding quarter.
 

 At all times since 1880, during a period of 56 years, it has been the legislative policy of the city to cast certain restrictions around the occupancy of closed stands by vehicles awaiting employment by passengers. And under the ordinances in effect at the time of the arrest of defendant, he was prohibited, according to the terms of section 47 read with section 3 of the taxicab ordinance, from occupying a stand on any public street or place (other than any of the open stands enumerated in section 2) unless armed with a permit, for use by him of that specific place, issued after payment of the license fee prescribed for the privilege.
 

 Since there is no dispute about the occupancy by defendant of the stand at West Portal Avenue without a permit, there was clearly a violation of the provisions of section 47. It remains then to consider whether that section, interpreted with the accompaniments of co-ordinate enactments, was within the competence of the municipal legislative body.
 

 Streets and highways are for the use of the traveling public, and, as members of the public, all persons in like situation have equal rights to use the streets and highways in a reasonable manner in the customary way. (13 Cal. Jur. 371.) However, the common right to use streets in the ordinary way is quite different from the right to use them as a place of business for private gain. Ordinary usage is the right of all, but there is no vested or constitutional right to subject a street to the conduct of private business. Such use, when authorized, is a special or extraordinary privilege. It is an added easement or burden on the street, and is not comparable to the right to conduct lawful business on private property. Use of a public street for private enterprise may under some circumstances redound to the public good; but nevertheless it is a special privilege peculiarly subject to regulation, and one which may be granted on reasonable terms or entirely withheld. (2 Elliott’s Roads and Streets, p. 1632;
 
 Hadfield
 
 v.
 
 Lundin,
 
 98 Wash. 657, 660 [168 Pac. 516, Ann. Cas. 1918C, 942, L. R. A. 1918B, 909];
 
 Scott
 
 v.
 
 Hart,
 
 128 Miss. 353, 358 [91 So. 17];
 
 Long’s Baggage Trans. Co.
 
 v.
 
 Burford,
 
 144 Va. 339, 344 [132 S. E. 355];
 
 Re Dickey,
 
 76 W. Va. 576, 584-586 [85 S. E. 781, L. R. A. 1915F, 840];
 
 Schoenfeld
 
 v.
 
 Seattle,
 
 265 Fed. 726, 732.)
 

 
 *Supp. 776
 
 Speaking in reference to a jitney business in
 
 Greene
 
 v.
 
 City of San Antonio,
 
 (Tex. Civ. App.) 178 S. W. 6, 9, the court said:
 

 “So in this case appellant has never had any vested right to use the streets of San Antonio to engage in the business of a common carrier of passengers for hire, and no right of his is infringed or invaded by the ordinance requiring certain things to be done in order to enter into business on the streets, which have, at the expenditure of large sums, been placed by the city in prime condition for automobile travel. The streets belong to the public, the city being its trustee, and no private individual or corporation has a right to use such streets for the prosecution of a business without the consent of the trustee and a compliance with the conditions upon which the permission to so use them is given. There could be no greater use of the streets for business purposes than that in which appellant is engaged. He must move swiftly along the streets, obstructing the passage, to some extent at least, of those who have a vested right to use the streets for passage, from point to point, he will, by building up and conducting his private business entirely on the streets, be wearing and wasting that which was primarily intended for the passage of persons along the streets, and to obtain these great privileges he must comply with the conditions fixed by the city of San Antonio. The conditions are reasonable, proper, and are promulgated in the interest of the general public.”
 

 The establishment of private stands for convenience of the public is of ancient origin. As is shown in
 
 Masterson
 
 v.
 
 Short,
 
 3 Abb. Pr. (N. S.) 154, 157-160; 30 N. Y. Super. 241; 33 How. Pr. 481, an act was passed early in the eighteenth century in the reign of Queen Anne for recognition of stands for hackney-coaches; and that act was superseded by an act of George III in 1772. Meanwhile in 1730 there was granted to the city of New York a charter, under the general power of which the common council acquired authority to establish coach-stands—an authority confirmed by a statute of the New York legislature in 1813.
 

 In the case cited, the purpose of such regulations is thus described (p. 157):
 

 “The system of hackney-coaches standing at designated places in the streets of a city grew out of the necessity of meeting
 
 the
 
 public demands. A
 
 demand
 
 arose in cities for means of transit from point to point other than by walking.
 
 *Supp. 777
 
 As the city increased in extent of territory and became more populous the demand increased. This gave rise to a class of men who procured one or more vehicles, according to their means, and plied the streets for hire. It was soon found necessary to place these men under special police regulations, and as one of those regulations to assign certain places in the streets where they might stand waiting for customers. Such regulation was necessary for the control of the haekman, and for the convenience of the public. Its object was to prevent the hackmen from traveling with their empty vehicles in search of custom in the streets otherwise sufficiently crowded, and also to prevent their stopping and remaining for any considerable time at inconvenient places; but the great object was to have hacks standing at various points * where the public would be most likely to want them, and where they would cause the least inconvenience to other vehicles or injury to the surrounding property.”
 

 In almost all the large cities of Europe and the United States, provision is made for established stands for vehicles for hire. In designating closed stands both the convenience of the public, and in many instances the interest of abutting property owners, must be considered. Attention has already been drawn to the fact that our taxicab ordinance in section 36 requires the written consent of frontagers to be obtained before location may be made of a stand affecting the rights of such abutting occupants. This requirement is in recognition of the right of frontagers to the enjoyment of the private easements attached to their premises, as is illustrated in
 
 Strong
 
 v.
 
 Sullivan,
 
 180 Cal. 331, 333, 334 [181 Pac. 59, 4 A. L. R. 343], and
 
 Cypress Lawn Cem. Assn.
 
 v.
 
 Lievre,
 
 55 Cal. App. 228 [203 Pac. 150], and other cases mentioned in the opinions. It is not, however, the consent of the frontager that establishes the right to maintain an exclusive stand adjacent to private property. The right is dependent on the issuance of a permit by the proper municipal authority and the payment of the prescribed license fee; but as a condition precedent the applicant must first obtain the written consent of the frontager affected. The frontager may prefer one applicant over another; and while under the ordinance there would be no absolute obligation to issue a permit to the frontager’s favorite, there would nevertheless be a lack of power to grant the permit to anyone else in the absence of the required written consent. So far, therefore, as ordinary
 
 *Supp. 778
 
 private property is affected, there is no provision in the ordinances for the establishment of a taxicab stand for anyone based on a mere unsupported official permit. And of course a driver who has not procured the requisite written consent, and is unprovided with a permit, would be guilty of violation of the law, if he were to invade a duly established private stand, in order to solicit patronage during the temporary absence of the regularly authorized permittee.
 
 (Mader
 
 v.
 
 Topeka, 106
 
 Kan. 867, 872, 873 [189 Pac. 969, 15 A. L. R. 340] ;
 
 Ewbank
 
 v.
 
 Yellow Cab Co.,
 
 84 Ind. App. 144, 154 [149 N. E. 647] ;
 
 Ritchhart
 
 v.
 
 Barton,
 
 193 Iowa, 271, 277 [186 N. W. 851];
 
 McFall
 
 v.
 
 St. Louis,
 
 232 Mo. 716, 730, 731 [135 S. W. 51, 33 L. R. A. (N. S.) 471] ;
 
 Montgomery
 
 v.
 
 Parker,
 
 114 Ala. 118, 126 [21 So. 452, 62 Am. St. Rep. 95].)
 

 In the present case the defendant is not charged with' occupation of an established stand in front of private premises. He was arrested while awaiting patronage on a stand located at a public place for which defendant had no permit, and which had been designated as a stand for the Yellow Cab Company. There is no evidence that the defendant or the Luxor Cab Company had ever applied for a stand at that location or anywhere in the vicinity. But it is contended that there is unjust discrimination in granting to the Yellow Cab Company an exclusive privilege for the stand in question, and that by reason thereof any other taxicab had at the time an equal right to occupy the stand when found vacant.
 

 In
 
 Commonwealth
 
 v.
 
 Rice,
 
 261 Mass. 340 [158 N. E. 797, 55 A. L. R. 1128], the court had under consideration an ordinance of the city of Springfield which bears resemblance to the ordinances here brought under review. The Springfield ordinance forbade any taxicab from standing on any public way to solicit passengers except in a place designated as a taxicab stand, and then only when licensed to occupy that stand.
 

 The defendant was arrested and fined for violation of the ordinance. He attacked the ordinance as unreasonable, dis-Í1 criminatory and unconstitutional. In affirming the judgment of conviction, the court upheld the validity of the ordinance, speaking as follows (p. 345) : “The rule in the case at bar which required taxicabs, and vehicles used for the carriage of persons and things for hire, to make use of taxicab stands, tends to the control of public traffic, protects persons from annoying solicitation, prevents confusion, disorder
 
 *Supp. 779
 
 and danger in the streets, and is a reasonable regulation (citing cases). The regulation establishing public stands being a reasonable and necessary one in the administration of public safety, it is obvious that a further by-law or ordinance was required to make the observance of the regulation reasonably possible through the exclusion of all other vehicles from the reserved space. No right of any citizen is impaired by an ordinance which prohibits the parking of vehicles at a place in a public street or highway where such person has no legal title to the land occupied by the street or highway and has no interest in such greater than an easement of travel which is held in common with all citizens.”
 

 In
 
 Chapman
 
 v.
 
 City of Portland,
 
 131 Me. 242 [160 Atl. 913], the plaintiff, a licensed taxicab operator, sought to enjoin enforcement of a portion of a municipal ordinance relating to the establishment of stands. In sustaining a general demurrer to the complaint, the court spoke as follows (pp. 245-247): “The validity of this general delegation of police power and the exercise of it by the municipality, within proper limits, is not and can not be questioned. . . . This right to conduct a private business on the public highway, however, is not inherent or vested, but is in the nature of a special privilege which the State, or municipality under its delegated power, may either condition, restrain, extend or prohibit. . . . The City of Portland undoubtedly in the exercise of its delegated police power, is authorized to limit the number of public vehicle stands upon its streets and fix their location, or even to prohibit them altogether, to the end that, without undue impairment of the public hackney service, traffic congestion may be prevented and the safety and convenience of public travel promoted. . . .
 

 “The right of application for the privilege of using established stands in the restricted area is open to all. It is not to be presumed that the officers of the Committee will exceed their lawful authority or, in its exercise, arbitrarily discriminate between applicants. Unless good and sufficient reasons for disapproval exist, we have no reason to doubt that all entitled to use established stands will obtain just and equal action upon their applications. The presumptions of law so point.
 

 “Nor does this requirement constitute an unlawful delegation of authority. What a municipality may forbid altogether, it may forbid conditionally unless its written permis
 
 *Supp. 780
 
 sion is obtained. The issuance of a permit therefor may be delegated to a city officer or a less numerous body than the one which enacts the prohibition.”
 

 When an ordinance is within the power of the municipality, the presumption is that it is reasonable, unless on its face unreasonableness is apparent. If the ordinance is not inherently unfair, unreasonable or oppressive, the burden is on the person attacking it to show its invalidity.
 
 (Henderson
 
 v. Bluefield, 98 W. Va. 640, 644 [127 S. E. 492, 42 A. L. R. 279];
 
 State
 
 v.
 
 York,
 
 90 Fla. 625, 628 [106 So. 418] ;
 
 Kissinger
 
 v.
 
 Hay,
 
 52 Tex. Civ. App. 295, 300 [113 S. W. 1005].)
 

 Although in the exercise of a power to grant permits, opportunity may be afforded at times to issue permits to social or political favorites, while applications of others are arbitrarily denied, yet in the absence of evidence to the contrary, it must be assumed that discrimination, if shown, is made in the interest of the public and in the orderly administration of the police power.
 
 (Fisher
 
 v.
 
 St. Louis,
 
 194 U. S. 361, 371 [24 Sup. Ct. 673, 48 L. Ed. 1019].) And as our Supreme Court said in
 
 In re Flaherty,
 
 105 Cal. 558, 562 [38 Pac. 981, 27 L. R. A. 529] : “Laws are not made on the theory of total depravity of those who are elected to administer them; and the presumption is that municipal officers will not use these small powers villainously or for purposes of oppression and mischief.”
 

 Since there is no evidence that an application by defendant or his company for a stand in the neighborhood of Ulloa Street and West Portal Avenue has been made or, if made, denied, _ defendant is not in a situation to complain of any discrimination on the part of the licensing authority. And it is to be borne in mind that a victim of unjust discrimination is not left remediless, since section 24 of the charter contains the provision, “If any application for a permit or license is denied by the department authorized to issue same, the applicant may appeal to the board of permit appeals.”
 

 In the brief of the
 
 amici curiae
 
 stress is laid on certain decisions of the courts of New York which should be noticed, especially since in later eases not cited in the brief, rulings have been made against the validity of ordinances authorizing exclusive stands. In a controversy involving the right to an exclusive stand in front of Rectors Hotel in New York City, a series of decisions was rendered in an injunction suit reported under the title of
 
 Odell et al.
 
 v.
 
 Bretney et al.,
 
 
 *Supp. 781
 
 in 62 App. Div. 595 [71 N. Y. Supp. 449] (1901), Id., 38 Misc. 603 [78 N. Y. Supp. 67], (1902) and 93 App. Div. 607 [87 N. Y. Supp. 655] (1904).
 

 The plaintiffs were Odell & Son, engaged in a livery business, with whom was joined the corporation known as Rectors; and the defendants were an unincorporated association known as Public Owners and Haekdrivers Association. Rectors Hotel was situated on Broadway between Forty-third and Forty-fourth streets. For a money consideration Rectors had given Odell & Son permission to maintain special hack-stands in front of the hotel; and upon such permission a license for such stands had been issued in 1899. The hotel premises abutted on a part of the space called “Long Acre Square”, starting at the, junction of Broadway and Seventh Avenue at Forty-third Street and extending to Forty-seventh Street. Within that space was a public hack-stand which the defendants had a right to use; and it was their contention that the stands in front of the hotel were embraced within the bounds of the public stand. In the original hearing in the trial court the ruling on that point was against the defendants ; and a preliminary injunction issued in favor of the plaintiffs was sustained on the appeal. (62 App. Div. 595 [17 N. Y. Supp. 449].) The case was then remanded for determination of the question whether a license for an exclusive stand was, as contended by defendants, beyond the power of the city authorities, the appellate court saying, however, that
 
 prima facie
 
 the plaintiffs had “a legal right to make use of the street in the manner and form authorized by the city”.
 

 On the further hearing in the trial court, it was held-in the opinion in 38 Misc. 603 [78 N. Y. Supp. 68], that while a special license might be given for a stand in front of a hotel in the immediate vicinity of which no public stand existed, yet neither public convenience nor necessity justified the establishment of a private stand in front of the hotel, when there had long been,' and still was, a public stand just opposite. The conclusion was that an unlawful obstruction was created by the Odell hacks; and the permanent injunction sought was denied. The decision on the appeal from that judgment is found in 93 App. Div. 607 [87 N. Y. Supp. 655]. As there stated, the Odell license had expired prior to the trial, and the Odells had ceased to use the stand. Accordingly it was held that the case was properly dismissed as to
 
 *Supp. 782
 
 them.; but the appellate court, reasserting its previous views, held that Rectors was entitled to the relief sought, and so •reversed the judgment, thus upholding the right to maintain a special stand.
 

 There has been cited to us also the case of
 
 City of New York
 
 v.
 
 Reesing et al.,
 
 77 App. Div. 417 [79 N. Y. Supp. 331], (1902) in which the defendants, who were livery-stable keepers, were, like Galena, prosecuted criminally for violation of an ordinance, and were convicted and fined. The defendants in that case, under an agreement with the Hotel Imperial to pay it a share of the gross receipts, maintained a stand for several cabs in front of the hotel, without paying a prescribed license fee of $25 for each cab and without procuring a special permit from the city. In that case all that was decided was that the consent of the property owner to the use of a stand in front of his premises did not exempt the concessionaire from payment of the license fee required by the ordinance. At the same time the court refused to consider the right of a hotel proprietor to maintain a cab service in the street in front of his premises or the right to establish such a stand without the consent of the owner or lessee. All that was decided was that the municipality had authority to require the special license fee for a permit according the privilege of maintaining a private stand.
 

 In 1913 a new ordinance known as the Public Hack Ordinance came into effect in New York City, which purported to abolish all existing public hack-stands and all special hack-stands. And by a separate ordinance sections of a former code, under which hack licenses had theretofore been granted, were repealed. The new ordinance was attacked as unconstitutional by the Yellow Taxicab Company and others and also by certain hotels which had previously sold the right to maintain private stands in front of their premises. For that privilege very large amounts in the aggregate, estimated to exceed $500,000, had been collected annually; but by a statute passed in 1913 the sale of such privileges was denounced as a misdemeanor. (Stats. 1913, chap. 813.)
 

 The decision of the trial court in the case attacking the new ordinance, which was rendered on an application for an injunction
 
 pendente lite,
 
 is reported under the general title of
 
 The Taxicab Cases
 
 in 82 Misc. 94 [143 N. Y. Supp. 279], and affirmed under the title of
 
 Yellow Taxicab Co.
 
 v.
 
 Gaynor
 
 in 159 App. Div. 893 [144 N. Y. Supp. 299], and by the court
 
 *Supp. 783
 
 of appeals in
 
 Waldorf Astoria Hotel Co.
 
 v.
 
 City of New York,
 
 in 212 N. Y. 97 [105 N. E. 803].
 

 Starting with the premise that the business of a public haekman is affected with a public interest, and that haekmen sustain such a peculiar relation to the public convenience and welfare that there is superinduced upon them the right of public regulation, the court considered in detail the various aspects of the new ordinance, including the provisions for the abolishment of all previously designated stands, public and special. After considering the ordinance in its various phases, the court pronounced it constitutional and denied the motion for an injunction. That ruling was affirmed on appeals of some of the parties " plaintiff as previously mentioned.
 

 The city of New York was thus held to have established a new policy by its ordinance of 1913.
 

 More recently the validity of an ordinance providing for exclusive taxicab stands came under attack in
 
 Farrell
 
 v.
 
 City of Syracuse,
 
 137 Misc. 472 [242 N. Y. Supp. 316], Under the Syracuse ordinance a considerable number of special stands had been allocated to various operators; but no stand had been designated for the use of operators generally. The plaintiff was engaged in the taxicab business under a general license therefor, but was prevented from occupying any of the special stands, and was threatened with arrest in case of use thereof. Accordingly, plaintiff instituted the action to obtain a permanent injunction against enforcement of the ordinance and an adjudication declaring the ordinance null and void.
 

 The decision was rendered on a motion for an injunction
 
 :pendente lite,
 
 which was granted in favor of the plaintiff. The court there ruled that the establishment of exclusive stands overshot lawful regulatory powers of the municipality in the control of traffic, and that the ordinance was unjustly discriminatory and hence void. No appeal seems to have been taken by the city; but the case is cited as authority in an opinion of the Attorney-General rendered in 1932 to the clerk of the Board of Trustees of Nyaek. (45 State Dept. Hep. 610, 612.) It may be noted also that by section 54 of the State Vehicle and Traffic Act (Stats. 1929, p. 78) local authorities were prohibited from excluding any owner or operator of a motor vehicle from the free use of any public
 
 *Supp. 784
 
 highway, subject, however, to the proviso that power previously given to license and regulate public vehicles for hire, and ordinances, rules and regulations in pursuance of such power, should remain in full force and effect.
 

 The Farrell case was cited as authority also in
 
 City of New York
 
 v.
 
 Yellow Taxi Corp.,
 
 157 Misc. 723 [284 N. Y. Supp. 544], decided in January, 1935'in the city court of New York and affirmed without opinion by the appellate term. (N. Y. L. J., Nov. 2, 1935, p. 1646.) In that case the city sued to recover $1800 as rent for the year 1933, at the rate of $150 a month, for the privilege of maintaining a stand for fifteen cabs at The Casino in Central Park at Seventy-second Street and East Drive. The court held that in view of the municipal ordinances providing only for public stands, and the statute of 1913 prohibiting any contract for the use of any part of a public highway, park or other public property as a private hack-stand, the attempt to establish a private or exclusive stand adjacent to The Casino in Central Park was without authority and the contract therefor was illegal and void.
 

 The only other case which has come to our notice holding exclusive permits for taxicab stands illegal is
 
 City of New Orleans
 
 v.
 
 Badie,
 
 146 La. 550 [83 So. 826]. In that case the defendant was convicted of violation of an ordinance providing that no taxicab for hire should stand on the public street without an official permit designating a specific location. He urged on appeal that the ordinance was discriminatory and denied equal protection of the laws. While the court recognized the right of a city to make reasonable regulations for the use of its streets in whatever way it chooses, yet the court laid down the rule that the city was under obligation to proceed according to some uniform system by which all of the same class would be protected against arbitrary or discriminatory action. The decision against the validity of the ordinance seems to have been influenced by what the court deemed an obnoxious practice on the part of abutting property owners, who were impelled to give their consent to operatives paying the largest rental. As has been seen, a way was found in New York to curb that evil by making such practice punishable as a misdemeanor.
 

 Private or special stands are not marked by visible physical boundaries. The location on which cabs stand while
 
 *Supp. 785
 
 awaiting passengers is embraced within somewhat shifting lines. When no cab is on the stand, it is the recognized right of the public to travel over the space or to halt there temporarily for some special purpose; and rival operators, through their passengers, have the right to stop there to let passengers alight, without the right, however, to plant their cabs on the spot in order to solicit fresh patronage. (See
 
 McFall
 
 v.
 
 City of St. Louis,
 
 232 Mo. 716, 729 [135 S. W. 51, 33 L. R A. (N. S.) 471].)
 

 As has been shown in the eases cited, there is some contrariety of opinion concerning the power to establish special stands. We lean to the view, however, that it is within the power of the supervisors, under the changing conditions of modern transportation, to determine the course most likely to promote the convenience, safety and welfare of the traveling public, and to adopt the measures which will best assure adequate service and will be of the most practical benefit. All regulatory ordinances have restrictive, and sometimes prohibitory, features; and many exclusive franchises, though creating legal monopolies, are bestowed as a means of subserving the general welfare. For over half a century it has been the settled policy of San Francisco not only to establish public stands for passenger vehicles at suitable locations, but also, regard being had to the rights of property owners, to grant on fixed terms permits for private stands for the better accommodation of patrons and the orderly flow of traffic.
 

 In
 
 In re Graham,
 
 93 Cal. App. 88 [269 Pac. 183], the petitioner for a writ of
 
 habeas corpus
 
 was under sentence of imprisonment for violation of an ordinance, much like those under review here, prohibiting the operator of a vehicle from occupying a stand on the street, while awaiting employment, unless he had a permit assigning to him that place. The petitioner, who was a taxicab driver, challenged the ordinance on the ground that it was discriminatory. But as there was nothing to indicate that a permit for that place had been granted to anyone else, all the members of the court concurred in the view that he was not in a position to defend on the ground that the law was discriminatory; and accordingly, the conviction was affirmed. Two of the judges deemed it unnecessary to go further in the disposition of the case; and therefore, the decision cannot be regarded as a controlling precedent under the circumstances disclosed here.
 

 
 *Supp. 786
 
 So far as the Luxor Cab Company and the driver, Galena, are concerned, there is no intimation that special permits in other suitable locations have not been granted to them; and the only question before us is whether the defendant, while awaiting employment by passengers on a stand for which his company had no permit, subjected himself to the penalty of the law. Our conclusion is that he was guilty of violation of the ordinance as charged. Hence the judgment should be, and is, affirmed.
 

 Conlan, J., and Goodell, J., concurred.