[No. A116583. First Dist., Div. Two. Dec. 18, 2007.]

ALEX COTTA et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

**COUNSEL**

Law Offices of Paul J. Steiner, Paul J. Steiner; Sommers & Schwartz, Andrew H. Schwartz and Frank Sommers for Plaintiffs and Appellants.

Dennis J. Herrera, City Attorney, Joanne Hoeper, Chief Trial Deputy Attorney, and Scott D. Wiener, Deputy City Attorney, for Defendants and Respondents.

OPINION

HAERLE, J.—

## I. INTRODUCTION

In this appeal, we must determine whether the City and County of San Francisco (City)[1] may be liable for contract damages following a valid exercise of its police power. In March 2003, the San Francisco Airport Commission (Commission) passed a resolution granting certain benefits to drivers of clean air taxis providing transit service at San Francisco International Airport (SFO). Thereafter, plaintiffs and appellants Alex Cotta, Aloizio Costa, Majed Dajani, Andrew Lindemann, Isam Kayed, Mohamad Quitteineh, and Saleem Shaikh purchased compressed natural gas (CNG) taxicabs and operated them at SFO. In November 2003, the Commission adopted a new resolution that conferred reduced benefits, and appellants brought suit for breach of contract. On cross-motions for summary judgment, the trial court granted the City's motion and denied appellants' motion. Appellants challenge those rulings on theories of breach of contract, promissory estoppel, and inverse condemnation. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

In 1998, the Taxicab Alternative Fuels Working Group was formed for the purpose of encouraging the San Francisco taxicab industry to purchase cabs powered by CNG. The Commission initiated a pilot program of incentives to CNG cabs providing service at SFO in order to improve air quality at SFO while maintaining effective transit service for the public.

On October 3, 2000, to encourage the acquisition of new clean air vehicles, the Commission adopted a clean vehicle incentive program for taxis serving SFO. The resolution provided (1) the first 60 clean air cabs put into service would receive one front-of-the-line (FOL) privilege[3] per driver shift for two years, with the trip fee waived; (2) the next 50 clean air cabs put into service

---

[1] Appellants named as defendants the City and County of San Francisco, San Francisco Airport Commission, and San Francisco International Airport. We will refer to defendants and respondents collectively as the City.

[2] We derive our statement of the facts from the trial court's findings as to the undisputed facts, which adopted in its entirety the City's separate statement of undisputed facts in support of its motion. We also include relevant and undisputed facts from appellants' separate statement in support of their motion.

[3] The FOL privilege (also referred to as priority dispatch or short line access) permits a taxi to go immediately to the front of the line of taxis waiting to pick up customers rather than to the back of that line.

would receive one FOL privilege per driver shift for 18 months, with the trip fee waived; and (3) the next 50 clean air cabs put into service would receive one FOL privilege per driver shift for 12 months, with the trip fee waived. The resolution provided that the trip fee waiver incentive was subject to modification by the airport director.

From October 3, 2000, through April 3, 2001, one additional CNG taxi was put into service for a total of 10 CNG taxis operating out of SFO.

On April 3, 2001, the Commission adopted a new resolution modifying the incentive program for CNG taxis to add one additional FOL privilege per driver shift, for a total of two FOL privileges per shift. The resolution also provided that, "The duration of this new incentive shall be determined by the Airport Director in consultation with Airport staff, CNG taxi owners, and CNG providers. The Airport Director shall have the sole authority to begin, end or reinstate this new incentive."

As of March 24, 2003, 31 CNG taxis were operating out of SFO, an increase of 21 since April 3, 2001.[4]

On March 25, 2003, to further encourage the acquisition of CNG cabs, the Commission adopted a resolution modifying the incentive program once again.

The resolution provided: "1. The first 60 clean air taxicabs put into service will receive [FOL] privileges four times per day for four years. For the first two years, no trip fee will be charged for two of these trips per day. [¶] 2. The subsequent 50 clean air taxicabs put into service will receive [FOL] privileges four times per day for eighteen months. No trip fee will be charged for two of these trips. After eighteen months, these vehicles will receive [FOL] privileges two times per day, for which the standard taxi trip fee will be charged. [¶] 3. The subsequent 50 clean air taxicabs put into service will receive [FOL] privileges four times per day for one year. No trip fee will be charged for two of these trips. After one year, these vehicles will receive [FOL] privileges two times per day, for which the standard taxi trip fee will be charged. [¶] 4. Clean air taxicabs put into service after the initial 160 vehicles will receive [FOL] privileges two times per day for one year. These trips will be subject to the standard taxi trip fee."

The resolution did not contain language regarding authority to determine the duration of the incentives or to begin, end, or reinstate the incentives.

---

[4] With respect to the number of CNG cabs operating at SFO at that time, there is some confusion in the record as to whether it was 30 or 31. The parties both use the number 31, so we will do the same.

Between March 25, 2003, and November 4, 2003, an additional 72 CNG cabs were placed in service at SFO, an increase of 232 percent.

Within several months of the March 25, 2003, resolution, SFO became aware of logistical problems and growing conflict between driver/owners of CNG cabs and driver/owners of non-CNG cabs. In several memoranda to members of the Commission, the airport director described the success of the incentive program, particularly the FOL privileges, in increasing the number of CNG cabs, but also reported that demand for taxis at SFO had decreased (for a variety of reasons, including the economic downturn, the events of Sept. 11, 2001, and the startup of BART (Bay Area Rapid Transit) service to SFO in June 2003). The result was a significant increase in wait times, significant adverse economic consequences for drivers of regular taxis, and increased congestion in the staging lots for cabs generally due to space constraints at SFO.

SFO tried to alleviate the problems through procedural changes, but the attempted modifications were not successful. On Labor Day weekend 2003, a non-CNG taxicab driver work stoppage at SFO caused major operational problems. SFO held several meetings with interested parties, including drivers of both CNG and non-CNG cabs, to resolve the problems that had developed since the March 25, 2003, resolution. These efforts were unavailing.

On November 4, 2003, the Commission rescinded the prior clean taxi incentive program resolutions dated October 3, 2000, April 3, 2001, and March 25, 2003, and adopted a new resolution providing incentives to drivers of CNG taxis as follows: the incentives would be limited to the four-year service life of the first 140 CNG cabs; all CNG cabs would have one FOL privilege per shift for four years, with different trip fee waiver provisions based on the order in which the cab was put into service. The resolution provided that the taxicab incentive program would be phased out as the original 140 CNG cabs were retired after four years of service. In addition, the resolution stated, "The Airport Commission reserves the right to eliminate or modify these incentives at any time to meet operational needs of the Airport or in the event the Board of Supervisors and/or the Taxi Commission approves legislation mandating that a percentage of San Francisco taxicabs be clean fuel vehicles with no further accommodation to program participants."

In connection with his analysis supporting his November 2003 recommendation to airport director John Martin that FOL privileges be curtailed, deputy airport director for operations and security Trygg McCoy testified that he concluded that each lost FOL privilege was worth $35 to a cab driver.

On October 11, 2005, the Commission adopted a resolution continuing the FOL privileges under the November 4, 2003, resolution for CNG cab drivers who purchased a new CNG vehicle when their original CNG taxi reached the end of its service life under Taxi Commission regulations.

Of the 72 CNG cabs purchased between March 2003 and November 4, 2003, 56 were still in service as of the date the parties filed their summary adjudication and summary judgment motions on September 22, 2006. In addition, between November 4, 2003, and September 22, 2006, 56 more CNG cabs were placed in service at SFO.

On September 2, 2005, appellants filed their second amended complaint alleging causes of action for breach of contract, promissory estoppel, misrepresentation, negligent misrepresentation, and inverse condemnation. By order filed on January 3, 2006, the trial court sustained the City's demurrer to the causes of action for misrepresentation and negligent misrepresentation but overruled the demurrer as to the remaining causes of action.

Appellants filed their motion for summary adjudication on September 22, 2006. On the same day, the City filed its motion for summary judgment, summary adjudication, and/or judgment on the pleadings. The hearing was held on October 24, 2006, and the court took the matter under submission. On October 31, 2006, the court issued its order granting the City's summary judgment motion and denying appellants' summary adjudication motion.

Appellants filed a timely notice of appeal on December 26, 2006.

## III. DISCUSSION

### A. *Standard of Review*

"Summary judgment is granted only when the papers presented in support of the moving party establish that no issue of material fact exists to be tried and the moving party is entitled to judgment as a matter of law. [Citations.] On appeal, the reviewing court exercises its independent judgment, deciding whether the moving party established undisputed facts that negate the opposing party's claim or state a complete defense." (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 486–487 [59 Cal.Rptr.2d 20, 926 P.2d 1114].) Summary judgment may be affirmed on any theory, regardless of the ground relied on by the trial court. (*Kirby v. Sega of America, Inc.* (2006) 144 Cal.App.4th 47, 54 [50 Cal.Rptr.3d 607].)

### B. *Contentions*

Appellants contend that they entered into unilateral contracts with the City: they accepted the City's offer of the incentives described in the March 2003

resolution by purchasing and operating CNG taxis at SFO, i.e., by performance. Thereafter, according to appellants, the City breached those contracts when it enacted the November 2003 resolution which reduced the incentives. Appellants argue that, having purchased their services in furtherance of its goal of improving air quality at SFO, the City should be bound by its agreement.

The City responds that the March 2003 resolution was a legislative act providing a subsidy to CNG taxi drivers pursuant to the City's police power, and was not contractual in nature. As such, appellants had no vested right in the continuation of its provisions, and, even if the City had wanted to guarantee those benefits for a certain amount of time, it could not contract away its ability to exercise the police power in the future. The City argues that it did not purchase goods or services, the typical situation in which contractual obligations arise from the enactment of legislation. Further, none of the City's required public contracting formalities under the City charter were satisfied.

Appellants agree that the City enacted the resolutions pursuant to its police power, and that both the March 2003 and November 2003 resolutions were valid exercises of that power. The City at all times retained the police power to regulate taxi operations but, appellants claim, in so doing, it breached its contracts with them in November 2003 when it reduced the incentives it had promised in March of that year.

## C. *Legal Principles*

### 1. *The Police Power*

"A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) Often referred to as the "police power," this constitutional authority of counties or cities to adopt local ordinances is " 'the power of sovereignty or power to govern—the inherent reserved power of the state to subject individual rights to reasonable regulation for the general welfare.' (8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 784, p. 311.) The police power extends to legislative objectives in furtherance of public peace, safety, morals, health and welfare. (*Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 160 [130 Cal.Rptr. 465, 550 P.2d 1001].)" (*Massingill v. Department of Food & Agriculture* (2002) 102 Cal.App.4th 498, 504 [125 Cal.Rptr.2d 561].)

It is settled that a government entity may not contract away its right to exercise the police power in the future. (See, e.g., *Avco Community*

*Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 800 [132 Cal.Rptr. 386, 553 P.2d 546] (*Avco*); *County Mobilehome Positive Action Com., Inc. v. County of San Diego* (1998) 62 Cal.App.4th 727, 736–739 [73 Cal.Rptr.2d 409] (*County Mobilehome*); *Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716, 1724 [45 Cal.Rptr.2d 752] (*Alameda County*).) A contract that purports to do so is invalid as against public policy. (*County Mobilehome, supra,* 62 Cal.App.4th at p. 736.)

The *County Mobilehome* case is instructive. There, the county imposed a 15-year moratorium on the enactment of any rent control legislation with respect to mobilehome park owners who entered into an accord with the county. (*County Mobilehome, supra,* 62 Cal.App.4th at pp. 730–732.) The county enacted an ordinance whereby it agreed with any park owner who signed the accord that the county would not adopt any ordinance, rule, regulation, or initiative measure that would regulate how much the park owner could charge a resident for rent. (*Id.* at pp. 734–735.) The accord specified that its duration was 15 years and that its provisions were to govern over any inconsistent action taken by the county, such as the enactment of any ordinance or regulation. (*Id.* at p. 735.) Read together, the ordinance and the accord constituted a contractual agreement by the county not to enact rent control legislation for 15 years as to signatories of the accord. (*Id.* at p. 735.) The court held that the ordinance was facially unconstitutional and the accord was invalid because, together, they represented an express attempt by the county to surrender or bargain away its control of a police power. (*Id.* at p. 741.)

California courts have consistently invalidated agreements that had the effect of surrendering or impairing the police power. In *Alameda County,* two cities and a county entered into a memorandum of understanding (MOU) concerning a parcel of approximately 13,000 acres of open space, portions of which were in all three jurisdictions, agreeing to use their "best efforts" to adopt into their respective general plans certain specified goals and policies concerning that land. (*Alameda County, supra,* 38 Cal.App.4th at pp. 1719–1720.) The MOU further provided that any amendment to one of the entities' general plans concerning that land would not become effective unless the other two entities adopted parallel amendments. (*Id.* at p. 1720.) The plaintiffs challenged the MOU, seeking declaratory and injunctive relief. Division Five of this court held the agreement invalid, stating that it constituted "a surrender of each respondent's power to amend its own general plan. This policy divests each respondent, presently and in the future, of its sole and independent authority to amend its respective general plan, by providing outside jurisdictions a veto over such amendments. What the law has designed to be the exclusive power of an individual jurisdiction has become a contingent power, dependent on the concurrence of other jurisdictions." (*Id.* at pp. 1724–1725, fn. omitted.)

In *Avco*, a developer agreed to sell and dedicate coastal land to the county, conditioned upon the issuance of certain approvals for a building project. (*Avco, supra*, 17 Cal.3d at p. 799.) The approvals were granted, and the developer began work on the project. The developer relied on this agreement in seeking an exemption from a subsequently enacted coastal permit requirement. (*Id.* at pp. 788–789, 799.) Our Supreme Court held that the developer had not acquired a vested right to complete the development, either at common law or pursuant to statute. The court also rejected the developer's estoppel claim, explaining that even assuming the agreement "constituted a promise by the government that zoning laws thereafter enacted would not be applicable to [the developer's tract], the agreement would be invalid and unenforceable as contrary to public policy." (*Id.* at p. 800.) "Land use regulations, such as the [Coastal Zone Conservation] Act, involve the exercise of the state's police power [citation], and it is settled that the government may not contract away its right to exercise the police power in the future. [Citations.]" (*Id.* at p. 800.)[5]

Similarly, in *Delucchi v. County of Santa Cruz* (1986) 179 Cal.App.3d 814 [225 Cal.Rptr. 43] (*Delucchi*), the plaintiff landowners and the county entered into a land use agreement concerning coastal land. The plaintiffs sued for specific performance, damages, and attorney fees after the county adopted new zoning ordinances that conflicted with the agreement. On appeal, the court declined to interpret the agreement as precluding the city from changing its zoning, noting that if it upheld the interpretation urged by the plaintiffs, the contract would be invalid as one that purported to contract away the government's right to exercise the police power. (*Id.* at p. 823.) " ' " 'The police power being in its nature a continuous one, must ever be reposed somewhere, and cannot be barred or suspended by contract or irrepealable law. It cannot be bartered away even by express contract.' [Citations.] It is to be presumed that parties contract in contemplation of the inherent right of the state to exercise unhampered the police power that the sovereign always reserves to itself for the protection of peace, safety, health and morals. Its effect cannot be nullified in advance by making contracts inconsistent with its enforcement . . . ." [Citations.]' (*Carty*[ v. *City of Ojai* (1978) 77 Cal.App.3d 329,] 342 [143 Cal.Rptr. 506], quoting *Mott* v. *Cline* [(1927) 200 Cal. 434,] 446 [253 P. 718].)" (*Delucchi, supra*, 179 Cal.App.3d at p. 823.)

---

[5] In ruling that a developer has no vested right to complete a building project before building permits are issued, the court stated that any change in the rule that a developer has no vested rights in existing zoning must come from the Legislature. (*Avco*, 17 Cal.3d at p. 796.) Thereafter, the Legislature enacted a statute permitting local governments to freeze zoning early in the development process, before building permits are issued. (See *Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 229–230 [100 Cal.Rptr.2d 740].)

## 2. *The Taxicab Industry*

■ The regulation of the taxicab industry is a traditional subject of the police power of cities and counties. (See Veh. Code, § 21100, subd. (b) [providing that "[l]ocal authorities may adopt rules and regulations by ordinance or resolution . . ." regarding "[l]icensing and regulating the operation of vehicles for hire and drivers of passenger vehicles for hire"]; Veh. Code, § 21112 ["Local authorities may by ordinance license and regulate the location of stands on streets and highways for use by taxicabs and other public carriers for hire in their respective jurisdictions."].)

Local authorities act pursuant to their police power in regulating virtually all aspects of the taxicab business, including who may operate a cab, how many cabs may be operated, how much cabs may charge, where cabs may travel, and where cabs may pick up passengers. (See, e.g., *O'Connor v. Superior Court* (1979) 90 Cal.App.3d 107, 113–114 [153 Cal.Rptr. 306] [license or permit to operate a taxicab is granted by local government entity pursuant to police power]; *People ex rel. Freitas v. City and County of San Francisco* (1979) 92 Cal.App.3d 913, 923, 927 [155 Cal.Rptr. 319] [affirming City's power to regulate cabs]; *In re Petersen* (1958) 51 Cal.2d 177, 182–183 [331 P.2d 24] [affirming City's power to designate certain stands for the exclusive use of certain taxi companies in picking up passengers]; *People v. Buck* (1950) 101 Cal.App.2d Supp. 912, 915 [226 P.2d 87] [affirming power of county to prohibit cabs from operating in specific areas of county]; *People v. Galena* (1937) 24 Cal.App.2d Supp. 770, 775 [70 P.2d 724] (*Galena*) [affirming power of city supervisors to regulate taxicab stands to promote the convenience, safety, and welfare of the traveling public, and to adopt measures that will best assure adequate service and will be of the most practical benefit].)

In addition, California courts have consistently held that taxicab drivers do not obtain any vested right in the grant of permission to operate taxicabs on the public roadways. Rather, that permission may be altered at the discretion of the issuing authority. For example, in *Luxor Cab Co. v. Cahill* (1971) 21 Cal.App.3d 551 [98 Cal.Rptr. 576], the plaintiff cab drivers and a cab company challenged the city's issuance of additional cab medallions, arguing that it "infringed on the vested rights of present certificate holders." (*Id.* at p. 558.) The court rejected the argument: "The use of streets by taxicabs is a privilege that may be granted or withheld without violating either due process or equal protection. This privilege may be granted exclusively or nonexclusively to render public services [citation]. In any event, the granting or withholding of a privilege based upon certificates of public convenience and necessity presents no judicial controversy touching on the impairment of vested rights [citation]." (*Ibid.*)

In *Galena*, the defendant was convicted of violating an ordinance that prohibited taxis from picking up passengers at specific taxi stands for which they had not obtained a permit. The court rejected the plaintiff's argument that he had a vested right to pick up passengers there: "Streets and highways are for the use of the traveling public, and, as members of the public, all persons in like situation have equal rights to use the streets and highways in a reasonable manner in the customary way. [Citation.] However, the common right to use streets in the ordinary way is quite different from the right to use them as a place of business for private gain. Ordinary usage is the right of all, but there is no vested or constitutional right to subject a street to the conduct of private business. Such use, when authorized, is a special or extraordinary privilege. It is an added easement or burden on the street, and is not comparable to the right to conduct lawful business on private property. Use of a public street for private enterprise may under some circumstances redound to the public good; but nevertheless it is a special privilege peculiarly subject to regulation, and one which may be granted on reasonable terms or entirely withheld. [Citations.]" (*Galena, supra,* 24 Cal. App. 2d at p. Supp. 775.)

■ In *O'Connor v. Superior Court, supra,* 90 Cal.App.3d 107, the court rejected a challenge to a proposition passed by popular vote that required all existing taxicab permittees to exchange their permits for new ones which, unlike the old ones, would be nontransferable and nonassignable. The court held that "[a] license or permit to engage in the taxicab business, issued by the city pursuant to its police power, does not convey a vested property right." (*Id.* at p. 114.) In so doing, the court explained that "an ordinance adopted in the exercise of the police power does not create contract rights in the continuation of the regulation." (*Ibid.*; see also Gov. Code, § 9606 ["Any statute may be repealed at any time, except when vested rights would be impaired. Persons acting under any statute act in contemplation of this power of repeal."].)

## D. *Contract Claims*

Based on the legal principles discussed above and the undisputed facts, we conclude that no contract was formed. The several resolutions adopted by the City in furtherance of its goal of cleaner air at SFO, including those of March and November 2003, were part of a pilot program, the clean vehicle program for taxis serving SFO. These were regulatory acts, adopted by the City pursuant to its police power. The incentives, FOL privileges and trip fee waivers were created by modifying regulations already in place that governed taxi operation at SFO, specifically, the order in which taxis may pick up passengers and the fees taxis must pay per trip. These modified regulations clearly were experimental and subject to change. It is apparent that the Commission was experimenting with the level of incentives in its efforts to

encourage the purchase and operation of CNG cabs while also maintaining effective public transit at SFO. The Commission adjusted the incentives upwards to encourage the placement into service of more CNG cabs. The Commission adjusted the incentives downwards when they caused operational problems.

Appellants make much of the fact that the March 2003 resolution included no provision reserving authority to change or end the incentives, and argue that the absence of such provision evidenced the City's intent to guarantee that the incentives would not be changed. The incentive program as delineated by the earlier 2000 and 2001 resolutions contained clauses reserving discretion in the airport director to make changes, and there is no dispute that, prior to March 2003, the program was subject to change. We disagree with appellants that the omission of a provision giving the airport director the individual authority to make changes also took away the power of the Commission to act in accordance with its established procedures. We will not infer intent to contract on the part of the City based on the mere omission of a statement granting additional authority to the director to amend the regulations. The program's experimental, conditional nature was not transformed to binding and contractual by the failure to state what was obvious: the program was subject to change.

As an additional reason the March 2003 resolution did not create contracts, the City argues that it did not comply with charter provisions that govern City contracting. Specifically, the resolution/alleged contract was not approved as to form by the city attorney, and there was no certification from the controller that sufficient funds were available. (See S.F. Charter, §§ 6.102, subd. 6, 3.105.[6]) In *Transdyn/Cresci JV v. City and County of San Francisco* (1999) 72 Cal.App.4th 746, 758–760 [85 Cal.Rptr.2d 512], both of these requirements were held to be ministerial and the failure to satisfy these requirements did not invalidate the otherwise binding contract. However, unlike the public works contract in *Transdyn/Cresci*, here there is no contract.

We also reject appellants' attempt to recharacterize this case as involving the *purchase* by the City of clean air at the airport. Appellants argue this "government as purchaser" point in order to bring this case within the ambit of others in which courts have found that statutes enacted pursuant to the police power involving the purchase of goods or services created contract rights. In *County of San Luis Obispo v. Gage* (1903) 139 Cal. 398, 406–407

---

[6] City and County of San Francisco Charter section 3.105 provides: "No officer or employee shall bind the City and County to expend money unless there is a written contract or other instrument and unless the Controller shall certify that sufficient unencumbered balances are available in the proper fund to meet the payments under such contract or other obligation as these become due."

[73 P. 174], the court found an implied contract between the county and the state under a law that provided for payment of specified sums annually for the maintenance and support of orphans. In *California Medical Assn. v. Lackner* (1981) 117 Cal.App.3d 552 [172 Cal.Rptr. 815] (*Lackner*), the court found an implied contract between the state and Medi-Cal providers who treated patients in reliance upon a statutory scheme that provided for reimbursement for services rendered to Medi-Cal patients. And in *California Teachers Assn. v. Cory* (1984) 155 Cal.App.3d 494, 507–508 [202 Cal.Rptr. 611], the court found that the state impliedly promised to fund the teachers' pension fund. In all three cases, the courts found implied contracts based on legislative intent to grant private rights of contract through specific promises to pay compensation for services rendered. (See *Lackner, supra,* 117 Cal.App.3d at p. 560, fn. 8, quoting *Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 23 [157 Cal.Rptr. 706, 598 P.2d 866] [" '[T]he right to compensation vest[ed] upon performance of the . . . work . . . .' "].)

These cases bear no resemblance to the situation presented here. The terms of the March 2003 resolution created a modified regulatory framework in the form of a subsidy for CNG taxicab operators. Unlike the cases appellants cite, here there simply was no intent to grant private rights of contract, no promise to pay for services rendered, and no vested right to compensation upon performance. In other words, no contract can be implied under these circumstances.

Moreover, even assuming, arguendo, that the City and appellants did in fact enter into contracts, those contracts would be invalid and unenforceable. (See *County Mobilehome, supra,* 62 Cal.App.4th at pp. 736–738, and cases cited therein.) In *County Mobilehome,* the court concluded that the accord and ordinance represented an express effort by the county to surrender its police power. The ordinance and accord created a scheme under which the county retained its police power to regulate rents as to mobilehome park owners who had not signed the accord, but attempted to give up that power for 15 years as to signatories of the accord. In so doing, the county "thus appear[ed] to be exposing itself to breach of contract damages if the [a]ccord were breached by the enactment of rent control measures applicable to those parks." (*Id.* at p. 739.) The court explained, "The vice of this ordinance, as tied to the [a]ccord, is that it chills the [c]ounty's exercise of police power for the specified time, even if there are significantly changed circumstances, through such potential exposure to litigation and damages." (*Id.* at pp. 739–740.)

Similarly here, *assuming* the formation of a contract, the March 2003 resolution can be characterized as an effort by the City to surrender its police power. Under the resolution, the City attempted to give up its police power to

regulate FOL privileges and trip fees as to CNG taxis at SFO for up to four years. Enacting a different resolution in response to changed circumstances would have the effect of exposing the City to breach of contract damages, which is precisely what appellants propose. *County Mobilehome* found such chilling of the police power to be untenable, and we find the same principle applicable here. The City cannot be put to the choice between maintaining functional taxi service at SFO on the one hand, and exposure to contract damages on the other. Thus, the alleged contracts were and are invalid and unenforceable.[7] (See *Avco, supra,* 17 Cal.3d at p. 800; *County Mobilehome, supra,* 62 Cal.App.4th at pp. 736–738; *Alameda County, supra,* 38 Cal.App.4th at pp. 1724–1725; *Delucchi, supra,* 179 Cal.App.3d at pp. 823–824; *108 Holdings, Ltd. v. City of Rohnert Park* (2006) 136 Cal.App.4th 186, 194–195 [38 Cal.Rptr.3d 589]; see also *Trancas Property Owners Assn. v. City of Malibu* (2006) 138 Cal.App.4th 172, 181–182 [41 Cal.Rptr.3d 200] [agreement between city and developer providing exemption from zoning restrictions was invalid because it attempted to abrogate city's zoning authority].)

Appellants urge us not to follow *County Mobilehome* and, instead, refer us to *Teachers Management & Inv. Corp. v. City of Santa Cruz* (1976) 64 Cal.App.3d 438 [134 Cal.Rptr. 523] (*Teachers Management*) in support of their contention that an award of contract damages is required "where a government entity obtains services to promote the public welfare by entering into a contract with some of its citizens and later decides that it must breach that contract in the public interest."

In *Teachers Management*, the city and a developer entered into an agreement for the purchase and development of a convention center on certain real property. Subsequently, the voters of Santa Cruz passed an initiative prohibiting the city from owning, leasing, developing or maintaining a convention center on the property. The plaintiffs sought declaratory and injunctive relief against the city, claiming that the initiative ordinance was void for a number of reasons including, as relevant here, that it unconstitutionally impaired contracts plaintiffs had entered into with the city. (*Teachers Management, supra,* 64 Cal.App.3d at pp. 447–448.) The court upheld the validity of the ordinance. Although the plaintiffs had not brought a cause of action for breach of contract, the court stated, "the people of Santa Cruz were not powerless to act through the initiative to change a policy of their city. [Citation.] The existence of binding agreements cannot prevent a public entity from abandoning or rescinding its plans to proceed with a public works project, although the change in policy may result in the entity's being liable for breach of contract." (*Id.* at p. 448, citing *Lavine v. Jessup* (1958) 161

---

[7] Quite rightly, appellants' counsel conceded at oral argument that if a contract is "invalid" or "unenforceable," no money damages are recoverable for its alleged breach.

Cal.App.2d 59, 68–69 [326 P.2d 238] (*Lavine*); see also *Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach* (2001) 86 Cal.App.4th 534, 563 [103 Cal.Rptr.2d 447].)

First and foremost, this statement in *Teachers Management* is clearly dicta. The plaintiffs there did not sue for damages for breach of contract. Second, the actual holding of *Teachers Management* was that the challenged ordinance *was* valid, notwithstanding the prior contracts of the city. And finally, regarding this statement in *Teachers Management*, it is instructive to refer to the *Lavine* case it cited. There, a taxpayer sued a county and others when the board of supervisors changed the location of a planned courthouse and designated the original site as a parking lot. (*Lavine, supra*, 161 Cal.App.2d 59.) The *Lavine* court rejected the taxpayer's argument that the county's action violated constitutional prohibitions against impairment of contract rights *because no contract cause of action was pled*. Appellants seize upon the *Lavine* court's statement that "[t]he right of a public body to rescind its action and abandon improvement proceedings without other liability than that flowing from a breach of contract has been recognized in various cases, such as *Brooks v. City of Gilroy* [(1934)] 219 Cal. 766 [29 P.2d 212]." (*Id.* at p. 68.) The entirety of the *Lavine* court's discussion of *Brooks* was: "This was an action by an engineer to recover for services rendered in connection with certain improvement work. Although the city had a city engineer, the court held it had the power to appoint an engineer for the improvements in question after declaring the office of city engineer vacant and the contract so made with the second engineer was declared legal. The present controversy, of course, is *not an action for breach of contract* but one making far more serious charges." (*Lavine, supra*, 161 Cal.App.2d at pp. 68–69, italics added.)

We next turn to *Brooks*, which references the very similar case of *Kennedy v. City of Gustine* (1926) 199 Cal. 251 [248 P. 910]. Both of these cases involved engineers with contracts of employment to make street improvements pursuant to the Street Improvement Act of 1911 (Stats. 1911, ch. 397, p. 730). In both cases, the existence of the contracts under the Act and the performance of engineering services pursuant to those contracts were admitted. In both cases, the cities began construction projects and then abandoned them. In both cases, the courts affirmed judgment of reasonable compensation for the engineers for services rendered in connection with their contracts.

As between the two lines of cases, the first represented by *County Mobilehome* and the other by *Teachers Management*, we find the reasoning of *County Mobilehome* more applicable and persuasive in the present circumstances. The alleged contracts at issue here are not agreements to purchase goods or employment services; they are not public works projects; and they

do not involve land development or oil drilling leases. Rather they fall within the broad category of an exercise of the City's regulatory power. Here, for the specified durations, the City gave up its authority to make changes to the incentive program. A holding that these contracts were valid and enforceable would put the City to a choice between adjusting the incentive program and incurring potential liability for breach of contract, on the one hand, and leaving the incentive program and the problems with taxi service at SFO unchanged, on the other. Such a holding would impose an impermissible chilling effect on the City's exercise of the police power. (See *County Mobilehome, supra*, 62 Cal.App.4th at pp. 736–738.)

### E. *Estoppel*

#### 1. *Promissory Estoppel*

The City sought and obtained summary adjudication of appellants' promissory estoppel cause of action. On appeal, appellants seek reversal of the judgment granting the City's summary judgment motion and denying their motion for summary adjudication of the City's liability for breach of contract damages. However, nowhere in the briefing do appellants specifically contend that their cause of action for promissory estoppel, as opposed to their cause of action for breach of contract, should still stand.

■ "Promissory estoppel is 'a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced.' [Citation.]" (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310 [96 Cal.Rptr.2d 747, 1 P.3d 63].) " 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. . . .' [Citations.]" (*Id.* at p. 310.) "To be binding, the promise must be clear and unambiguous. [Citations.]" (*Lange v. TIG Ins. Co.* (1998) 68 Cal.App.4th 1179, 1185 [81 Cal.Rptr.2d 39].) Here, any promissory estoppel claim fails because the facts do not show that the City promised not to amend the incentive program.

#### 2. *Equitable Estoppel*[8]

Appellants also contend that the doctrine of equitable estoppel should be applied to estop the City from denying liability for breach of contract.

---

[8] Promissory estoppel is based on a promise; equitable estoppel is based on misrepresentation of an existing fact. (*Panno v. Russo* (1947) 82 Cal.App.2d 408, 412 [186 P.2d 452].)

"The doctrine of equitable estoppel is based on the theory that a party who by his declarations or conduct misleads another to his prejudice should be estopped from obtaining the benefits of his misconduct." (*Kleinecke v. Montecito Water Dist.* (1983) 147 Cal.App.3d 240, 245 [195 Cal.Rptr. 58].) "The required elements for an equitable estoppel are: (1) the party to be estopped must be apprised of the facts; (2) the party to be estopped must intend his or her conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) the other party must rely upon the conduct to his or her injury." (*Munoz v. State of California* (1995) 33 Cal.App.4th 1767, 1785 [39 Cal.Rptr.2d 860]; see *Wolitarsky v. Blue Cross of California* (1997) 53 Cal.App.4th 338, 345 [61 Cal.Rptr.2d 629].)

"It is well settled that the estoppel doctrine is applicable to government entities where ' "justice and right require it." [Citations.] Correlative to this general rule, however, is the well-established proposition that an estoppel will not be applied against the government if to do so would effectively nullify "a strong rule of policy, adopted for the benefits of the public[.]" [Citation.] The tension between these twin principles makes up the doctrinal context in which concrete issues are decided.' " (*City of Glendale v. Superior Court* (1993) 18 Cal.App.4th 1768, 1781 [23 Cal.Rptr.2d 305].)

An essential element of equitable estoppel is that the party to be estopped, here the City, "intended by [its] conduct to induce reliance by the other party, or acted so as to cause the other party reasonably to believe reliance was intended." (*Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864, 868 [5 Cal.Rptr.3d 634].) We fail to see how appellants could reasonably believe the City intended appellants to rely on the March 2003 resolution to bind the City to make no further changes to the incentives, particularly since appellants concede that they did not rely on earlier resolutions enacted pursuant to this program. Moreover, we will not apply an estoppel in this situation where to do so would chill the City's exercise of its police power.

## F. *Inverse Condemnation*

Appellants next contend that the City's taking of their contract rights is properly subject to an inverse condemnation claim, and that material issues of fact require this claim to be resolved at trial.

Article I, section 19 of the California Constitution provides, in pertinent part, that "[p]rivate property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." Our Supreme Court has held that " 'the rule requiring compensation for property taken for or injured in

connection with public use has been held to apply to personal property, such as valid contracts and contractual rights . . . .' " (*City of Oakland v. Oakland Raiders* (1982) 32 Cal.3d 60, 66–67 [183 Cal.Rptr. 673, 646 P.2d 835].) This claim fails because appellants have no contractual rights arising out of the March 2003 resolution.

## IV. DISPOSITION

The orders appealed from are affirmed.

Kline, P. J., and Richman, J., concurred.